In the Matter of the Tax Appeal of·OTIS ELEVATOR COMPANY, Plaintiff-Appellant

NO. 5632

JUNE 29, 1977

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR and KIDWELL, JJ.

164

OPINION OF THE COURT BY OGATA, J.

Otis Elevator Company, Inc., a New Jersey corporation doing business in Hawaii (hereinafter referred to as taxpayer), has appealed from the findings of fact and conclusions of law and the judgment of the Tax Appeal Court, which upheld the validity of an assessment of additional use tax on property which the taxpayer had imported into the state during 1966 through 1970. The decision was based upon stipulated facts. We affirm.

The taxpayer is a fully vertically integrated business. As such it manufactures elevator and escalator components and parts at various factories located out of the state. These components and parts are then imported into this state by the taxpayer where they are used by taxpayer in the performance of its business. There are no manufacturers located in this state who manufacture elevator and escalator components

and parts. As explained in the taxpayer's opening brief, "[t]here are no 'middlemen' between (the taxpayer) and the ultimate users of its products."

In this state, the taxpayer is engaged in four aspects of this business. Two aspects of the taxpayer's business consisted of (1) performing regular maintenance service and (2) performing occasional repair service, both of which included installation of replacement parts as necessary. These aspects of the taxpayer's activities can be described as "service business."[1] Indeed, in this regard the taxpayer has paid an excise tax as a person engaged in a service business pursuant to HRS § 237-13(6) (Supp. 1975),[2] on each of these business activities. The two other aspects of the taxpayer's business consisted of (3) assembling and installing "knocked down" elevator and escalator units under construction subcontracts and (4) doing complete renovation work on existing elevator and escalator units under modernization contracts, which included assembly and installation of components and parts as necessary. These latter aspects of the taxpayer's activities can be described as "contracting." Indeed, the taxpayer has

---

[1] HRS § 237-7 defines "service business or calling" as follows:

§ 237-7 *"Service business or calling"*, *defined*. "Service business or calling" includes all non-professional activities engaged in for other persons for a consideration which involve the rendering of a service as distinguished from the sale of tangible property or the production and sale of tangible property. "Service business or calling" does not include the services rendered by an employee to his employer.

[2] HRS § 237-13(6) (Supp. 1975) states:

§237-13 *Imposition of tax*. There is hereby levied and shall be assessed and collected annually privilege taxes against persons on account of their business and other activities in the State measured by the application of rates against values of products, gross of sales, or gross income, whichever is specified, as follows:

*        *        *        *        *

(6) Tax on service business. Upon every person engaging or continuing within the State in any service business or calling not otherwise specifically taxed under this chapter, there is likewise hereby levied and shall be assessed and collected a tax equal to four per cent of the gross income of any such business; . . . .

paid an excise tax as a "contractor"[3] pursuant to HRS § 237-13(3) (A),[4] on each of these business activities. It is significant, however, that the record does not show that the taxpayer has ever paid any excise tax as a retailer under HRS § 237-13(2) or HRS § 237-16 (Supp. 1975) for any portion of these four aspects of its business activities.

During the tax years in question, 1966 through 1970, the taxpayer had imported into the state, in connection with aspects (1) and (2) of its business activities, components and parts with a finished-product landed value[5] of $477,740.76.[6] Apparently, the taxpayer had paid a use tax upon only $2,041.76 worth of these components and parts.[7] Also during the same tax years in question, the taxpayer had imported

---

[3] HRS § 237-6 (Supp. 1975) defines "contractor" as follows:

§237-6 *"Contractor"*, *"federal cost-plus contractor"*, *defined*. "Contractor" includes, for purposes of this chapter:

(1) Every person engaging in the business of contracting to erect, construct, repair, or improve buildings or structures, of any kind or description, including any portion thereof, or to make any installation therein, or to make, construct, repair, or improve any highway, road, street, sidewalk, ditch, excavation, fill, bridge, shaft, well, culvert, sewer, water system, drainage system, dredging or harbor improvement project, electric or steam rail, lighting or power system, transmission line, tower, dock, wharf, or other improvements; and

\*　　\*　　\*　　\*　　\*

[4] HRS § 237-13(3) (A) states:

§237-13 *Imposition of tax*. There is hereby levied and shall be assessed and collected annually privilege taxes against persons on account of their business and other activities in the State measured by the application of rates against values of products, gross proceeds of sales, or gross income, whichever is specified, as follows:

(3) Tax upon contractors.

(A) Upon every person engaging or continuing within the State in the business of contracting, the tax shall be equal to four per cent of the gross income of the business; provided, that insofar as the business of contracting is taxed by section 237-16, which relates to certain retailing, the tax shall be that levied by section 237-16.

[5] The term "finished-product landed value" as used in this opinion includes the value of raw materials, shop overhead, transportation and administration expenses.

[6] Per notice of assessment dated October 9, 1971.

[7] Per notice of assessment dated October 9, 1971.

into the state, in connection with aspects (3) and (4) of its business activities, components and parts with a finished-product landed value of $6,366,179.15.[8] Apparently, the taxpayer has not declared or paid any use tax upon the importation of these components and parts.[9]

At the end of 1971, the taxpayer was assessed additional use tax for the years 1966 through 1970. Shortly thereafter, the taxpayer paid the additional tax under protest and commenced an action in the tax appeal court to recover the amounts paid.[10] During the course of the litigation, an amended notice of assessment was sent to the taxpayer. Pursuant to this notice, the taxpayer was assessed additional use tax at the rate of four percent[11] on $162,828.01[12] (the finished-product landed value) worth of the parts imported in connection with its service business, rather than $477,740.76, as stated originally.[13] Also, according to the

---

[8] Per notice of assessment dated October 9, 1971; see also stipulated facts ¶ 6 and ¶ 7.

[9] No figures are shown under the column "as returned" in the notices of assessment dated October 9, 1971.

[10] HRS § 40-35; HRS § 238-8; HRS § 235-114 (Supp. 1975).

[11] HRS § 238-2(3) states:

§238-2 *Imposition of tax; exemptions.* There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

*       *       *       *       *

(3) In all other cases, four per cent of the value of the property.

[12] See notice of assessment dated January 9, 1974, under additional amount taxable; see also stipulated facts ¶ 14.

[13] Stipulated facts ¶ 14, and notice of assessment dated October 9, 1971.

amended notice, the taxpayer was assessed additional use tax at the rate of one-half of one percent[14] on \$9,184,380.46,[15] rather than \$6,366,179.15, of the finished-product landed value of all the components and parts imported in connection with its contracting business.[16]

In the tax appeal court the taxpayer did not dispute that the use tax applies to the items of tangible personal property it had imported into the state in connection with its business. Rather, it objected to the rate that the tax director applied and to the measure of the tax base which the tax director applied in determining the amount of the tax. The taxpayer's two basic contentions are: (1) That its use tax liability by reason of the importation of parts in connection with its service business should be determined according to HRS § 238-2(2) (A), which imposes a one-half of one percent rate, rather than HRS § 238-2(3), which imposes a four percent rate; and, (2) That a use tax against it, on all components and parts

---

[14] HRS § 238-2(2) (C) states:

§238-2 *Imposition of tax; exemptions.* There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

*       *       *       *       *

(2) If the importer or purchaser is licensed under chapter 237 and is . . .
(C) a contractor importing or purchasing material or commodities which are to be incorporated by the contractor into the finished work or project required by the contract and which will remain in such finished work or project in such form as to be perceptible to the senses, the tax shall be one-half of one per cent of the purchase price of the property, if the purchase and sale are consummated in Hawaii; or, if there is no purchase price applicable thereto, or if the purchase or sale is consummated outside of Hawaii, then one-half of one per cent of the value of such property.

[15] Stipulated facts ¶ 7; but on the notice of assessment dated January 9, 1974, the figure shown is \$10,619,851.78.

[16] Judgment for \$9,167.34 was entered in addition to a judgment for \$55,115.35; the taxpayer asserts that the additional amount has been also paid.

imported in connection with both the service and the contracting aspects of its business, measured by the landed value of the fully finished components and parts unduly discriminates against the taxpayer in violation of the commerce clause of the U.S. Constitution[17] and HRS § 238-3(a) (Supp. 1975).[18]

Among its findings of fact and conclusions of law, the tax appeal court concluded that the parts imported in connection with its service business were imported for use and were consumed by the taxpayer in the performance of its service business rather than imported for resale to the taxpayer's customers and that therefore the taxpayer is not entitled to treatment under HRS § 238-2(2) (A). The court also concluded that the use tax does not discriminate against the taxpayer since equal treatment is accorded to the in-state and out-of-state taxpayers similarly situated.

I.

We are fully aware that a taxpayer engaged in a "Service business or calling",[19] as defined in HRS ch. 237, may also be involved in the resale of an article to a consumer as well as in rendering of a nonprofessional service. *In re Taxes, Alexander & Baldwin, Inc.*, 53 Haw. 450, 497 P.2d 37 (1972); *see also* HRS § 237-14. This was recognized by the legislature which enacted in 1970, subsequent to the taxable years in question, an amendment to HRS § 237-4, which added a new subsection (7) defining sales at wholesale:

(7) Sales of tangible personal property to a licensed person engaged in the service business, provided that (1)

---

[17] Art. I, Sec. 8, U.S. Constitution.

[18] HRS § 238-3(a) (Supp. 1975) states:

§238-3 *Application of tax, etc.* (a) The tax imposed by this chapter shall not apply to any property, or to any use of the property, which cannot legally be so taxed under the Constitution or laws of the United States, but only so long as, and only to the extent to which, the State is without power to impose the tax.

[19] See footnote 1.

said property is not consumed or incidental to the performance of the services; (2) there is a resale of said article at the retail rate of 4 per cent; and (3) the resale of said article is separately charged or billed by the person rendering the services.

While we recognize that HRS § 237-4(7) (Supp. 1975) is inapplicable to the instant case, the basic question confronting us is whether the components and parts installed in the elevators as well as escalators during the taxpayer's maintenance and repair work were sold by the taxpayer at retail. We agree with the taxpayer that this issue presents a question of fact. As the taxpayer admits in its reply brief, separate invoicing would supply some evidence to establish this fact. Of course, the mere installation of these components and parts to the equipment affixed to a building would be sufficient to pass title since they would become a part of realty. However, such an installation, without more, would not necessarily show an intent by the taxpayer to sell these articles to the consumers, and the actions undertaken by the taxpayer is, therefore, at least ambiguous. *Duhame v. State Tax Commission*, 65 Ariz. 268, 179 P.2d 252 (1947). On the record before us, we cannot hold that the tax appeal court erred in holding that the parts were imported by the taxpayer in connection with performing its service business and not for the purpose of resale.

In this respect HRS § 238-2(2) (A) states:

§238-2 *Imposition of tax; exemptions*. There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

        \*      \*      \*      \*      \*

(2) If the importer or purchaser is licensed under chapter 237 and is (A) a retailer or other *person*

> *importing* or purchasing *for purposes of resale,* not exempted by paragraph (1), . . . , the tax shall be one-half of one per cent of the purchase price of the property, if the purchase and sale are consummated in Hawaii; or if there is no purchase price applicable thereto, or if the purchase or sale is consummated outside of Hawaii, then one-half of one per cent of the value of such property. (Emphasis supplied.)

The taxpayer, relying upon the *Alexander & Baldwin* case, argues that during the tax years in question it was "a person importing . . . for purposes of resale." In that case we held that a taxpayer who was engaged in the business of selling appliance parts as well as in the business of providing the service of repairing appliances, had correctly characterized as imports for resale, within the meaning of HRS § 238-2(2) (A), the appliance parts which it imported to be sold to customers acquired in its capacity as repairman. In that case the facts establishing that the taxpayer was in the business of selling included the fact that it sold parts to independent repair businesses and the fact that in carrying on its business of repairing appliances, it "invoiced labor separately from materials and carried charges for parts and services separately on its books and records," a practice customarily followed by those of the taxpayer's customers who were also engaged in the repair business. We were persuaded to find that the taxpayer and its customers, who also were engaged in the repair business, were engaged in the retail sales of parts by the satisfaction of three criteria: 1) the appliance repairmen were subject to excise tax liability upon gross income derived from the transfer of appliance parts to their customers; 2) the repairmen manifested an intent to sell the parts at retail through separate invoicing; and, 3) the parts passed to the customer in substantially the same form as when the repairmen received them from the taxpayer. *Id.* 53 Haw. at 454, 497 P.2d at 40. On the other hand, we held that the same taxpayer was not engaged in the sale of paint to licensed taxpayers in the automobile painting business, because the "automobile painters manifested no intent to sell the paint to their customers at retail; there was no separate

invoicing." *Id.* 53 Haw. at 455, 497 P.2d at 40.

The *Alexander & Baldwin* case stands for the proposition that a "person importing . . . for purposes of resale" means a person engaged in the business of selling tangible personal property. Since the taxpayer is claiming to be entitled to a rate lower than the common four percent rate, the taxpayer has the burden of proving that it comes under the provision giving a lower rate and any doubts should be resolved against the taxpayer. *In re Pacific Marine & Supply Co.*, 55 Haw. 572, 524 P.2d 890 (1974); *Honolulu Star Bulletin v. Burns*, 50 Haw. 603, 446 P.2d 171 (1968).

The taxpayer contends that the essential facts of the *Alexander & Baldwin* case are practically identical to the facts of this case. However, in urging that it is a "person importing for purposes of resale" within the meaning of HRS § 238-2(2) (A), the taxpayer relies upon only two factors stipulated to in the tax appeal court, and articulated in *Alexander & Baldwin:* That it paid a general excise tax based on the gross receipts of its service business, which receipts included amounts which it attributes to components and parts; and, that in connection with the services performed by the taxpayer, the components and parts remained in substantially the same form after they were installed.[20]

[20] That the components and parts remained in substantially the same form is part of the stipulated facts. This stipulation governs the course of the litigation unless modified by the court to prevent manifest injustice. In re Taxes, 711 Motors, Inc., 56 Haw. 644, 547 P.2d 1343 (1976). Other courts have found that the components and parts do not keep the same character. *See,* Duhame v. State Tax Commission, 65 Ariz. at 280, 179 P.2d at 260 (1947):

Both parties here are agreed that decisions from other states are not too helpful and, in fact, are sometimes misleading by reason of the difference in Excise Acts. Nevertheless, the one basic principle that may be gleaned safely from the reported cases is that when a completed structure is erected on the owner's land, it is as much real property as the land itself. By no definition or reasoning is it tangible personal property. The constituent elements of personalty have been destroyed by a metamorphosis, i.e. by their incorporation into the completed structure. Through the contractor's application of skill and labor to the materials, something different has been wrought from their use and union, and the materials purchased are no longer to be distinguished as personalty. Therefore, *we hold that when the contractor buys materials and supplies for use in fulfilling his contract, he does not purchase them for resale* as tangible personal property, but for use in producing the completed job. He is not a trader or dealer. (Emphasis supplied.)

Absent from the record is any fact by which the taxpayer manifested an intent to engage in the business of selling the parts at retail. Here it does not appear from the record that the taxpayer sells parts independently from its service business; nor does it appear from the record that the taxpayer carried charges for parts and services separately on its books and records. Indeed the taxpayer stipulated and the tax appeal court found that in billing the customers after performing repairs and maintenance, the taxpayer does not separately invoice labor costs from charges for the parts used. Consequently, we believe that a conclusion that the taxpayer is engaged in the business of selling is not warranted from the record. Therefore, the *Alexander & Baldwin* case is distinguishable from the case at hand.

II.

The taxpayer's second contention is that applying the use tax rates[21] against the finished-product landed value of the components and parts would unduly discriminate against it and in favor of similarly situated in-state vertically integrated businesses in violation of the commerce clause of the U.S. Constitution and HRS § 238-3(a) (Supp. 1975). The taxpayer relies upon *Halliburton Oil Well Co. v. Reily*, 373 U.S. 64 (1963), for the proposition that equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state. We have recently recognized this principle in *In re Taxes, Puna Sugar Company, Ltd.*, 56 Haw. 621, 547 P.2d 2 (1976), where we held that including transportation charges in the use tax base equalized the burden of the tax on property sold locally and property purchased from out of state and did not impose an undue burden on interstate commerce. *Halliburton Oil Well Co. v. Reily, supra,* requires that taking

---

[21] Use tax rate of four percent was applied by the director of taxation to components and parts imported by the taxpayer for maintenance and repair work, and a use tax rate of one-half of one percent was applied to components and parts for new construction and modernization work.

"the whole scheme of taxation into account", 373 U.S. at 69, the taxpayer is compared "to the in-state taxpayer who is most similarly situated", 373 U.S. at 71, and if "this comparison discloses discriminatory effects, it could be ignored only after a showing of adequate justification," 373 U.S. at 71.

The taxpayer asserts that it should be compared to an in-state manufacturer-retailer. We disagree. We deem that its business activities would properly require a comparison with an in-state manufacturer-contractor as to aspects (3) and (4), both of which relate to contracting, and a manufacturer-servicer as to aspects (1) and (2), both of which relate to a servicing business. Since the taxpayer was engaged in these two classifications of business, and has paid all gross excise taxes under these categories, we have separately analyzed each of these classifications.

While the record before us is claimed by the director of taxation to be insufficient to make an accurate comparison,[22] we have, nevertheless, attempted such a comparison by using the assumptions made by the taxpayer in the stipulation of facts with respect to the allocations of costs attributable to raw material, conversion, administrative, and shipping and related handling costs, as being true and correct.[23]

---

[22] The stipulation of facts divide the finished-product landed value of the components and parts imported in connection with the taxpayer's business into four parts, consisting of raw materials, conversion, administrative and shipping costs. For example, in 1966 the taxpayer imported components and parts with a finished-product landed value of $2,427,761.83. The breakdown of this figure was clarified by the taxpayer to be 33% raw material, 45% conversion, 15% administrative and 7% shipping. This data is insufficient to make an accurate comparison because these percentages may not be the same for a Hawaii manufacturer-contractor-servicer. For example, the cost of shipping of raw materials would likely be higher than the cost of shipping finished products since some raw materials could be expected to result in scrap in the process of manufacturing.

[23] The director states that he has refrained from discussing questions involving the allocations of material costs, conversion costs, administrative costs and transportation charges inasmuch as the taxpayer has not furnished necessary records from which these allocations may be verified. In this adversary proceeding the taxpayer has the burden to prove these items; however, where the taxpayer asserts that certain facts are true, we may accept those facts and proceed on that assumption for purposes of argument.

Our comparative analysis of the figures in regard to an out-of-state manufacturer-contractor and an in-state manufacturer-contractor based on the percentage allocations made by the taxpayer shows that the out-of-state manufacturer-contractor would definitely have an overwhelming tax advantage over the in-state manufacturer-contractor.[24] Under these circumstances any claim made by taxpayer that HRS ch. 238 exacts a use tax which discriminates against interstate commerce is without factual foundation. A comparison between the taxpayer and a similarly situated wholly in-state taxpayer based on the information available in the stipulation of facts shows that there is a limited discrimination against the out-of-state manufacturer-servicer.[25] We do not find, however, that this apparent discrimination helps the taxpayer in this case for the reasons which follow.

As *Halliburton Oil Well Co. v. Reily, supra,* has admonished us to do, we have compared the taxpayer to "the in-state taxpayer who is most similarly situated." 373 U.S. at 71. In this case we do not separately compare the taxpayer to a manufacturer-contractor and a manufacturer-servicer. Rather, our comparison must be between an in-state and an out-of-state vertically integrated manufacturer-contractor-servicer. Considering together the analysis given above, we find 'that we are able to determine conclusively from the record that the taxpayer in this case paid considerably less

---

[24] An example will suffice to show the difference. Assuming that the cost breakdown for an in-state manufacturer-contractor would be the same as that claimed by the taxpayer's breakdown for 1966, we find that the value of the raw materials imported by the in-state manufacturer-contractor would have been 40% (33% Raw Material + 7% Shipping) of the finished-product landed value ($2,427,761.83) or $971,104.73. The use tax liability at the four percent rate would have been $38,844.19. The use tax liability of the taxpayer in this case was $12,138.81 for 1966.

[25] For example, the out-of-state taxpayer (manufacturer-servicer) has incurred a use tax of $861.77 for the year 1966, while the in-state taxpayer (manufacturer-servicer) would incur a use tax of $310.24. The total amount of use tax payable by the out-of-state taxpayer during 1966 through 1970 will be $4,007.14 more than that paid by the in-state taxpayer.

total excise and use taxes during the years in question than its in-state counterpart would have paid.

We are constrained to hold that we do not perceive in the taxpayer's last contention that a use tax computed against it by applying the finished product landed value of the components and parts would be unduly discriminatory against it. As we have quoted in the past, " '[p]rohibited discriminatory burdens on interstate commerce are not to be determined by abstractions. Particular facts of specific cases determine whether a given tax prohibitively discriminates against interstate commerce.' (*Nelson v. Sears, Roebuck & Co.*, 312 U.S. 359, 366.)" *Stewarts' Pharmacies v. Tax Com'r Fase*, 43 Haw. 131, 144 (1959). In this case the taxpayer has not shown any particular facts on which to make a determination that the finished product landed value of the components and parts prohibitively discriminates against interstate commerce. *Complete Auto Transit, Inc. v. Brady*, 97 S. Ct. 1076 (1977). We, therefore, reject the taxpayer's argument concerning the constitutional point made with reference to the commerce clause as well as HRS § 238-3(a) (Supp. 1975). It is to be noted by the director of taxation that this part of the opinion is limited to a taxpayer who operates as a vertically integrated enterprise.

Accordingly, judgment is affirmed.

*Ronald W. K. Yee* (*Julian H. Clark* with him on the brief, *Case, Stack, Kay, Clause & Lynch* of counsel) for plaintiff-appellant.

*T. Bruce Honda*, Deputy Attorney General, for Director of Taxation, defendant-appellee.

CONCURRING OPINION OF KOBAYASHI, J.

I concur with the result of the opinion written by Justice Ogata and joined by Chief Justice Richardson.

DISSENTING OPINION OF KIDWELL, J.
WITH WHOM MENOR, J., JOINS

I am unable to agree with the opinion by which the judgment of the tax appeal court is affirmed in this case. Although lengthy dissents are to be avoided, I feel that there is a need to express the minority viewpoint in this case at greater length than would ordinarily be appropriate.

The issue dealt with in part I of the plurality opinion relates to the use tax rate applicable to parts imported by the taxpayer (Otis) for use in the course of maintenance and repair work. The tax appeal court concluded that these parts were not sold at retail but were consumed in use by Otis, because Otis had not separately invoiced its charges for parts and for labor, citing *In re Taxes, Alexander & Baldwin,* 53 Haw. 450, 497 P.2d 37 (1972). The plurality opinion correctly concludes that separate invoicing, for tax years preceding January 1, 1971 (the effective date of the amendment of HRS § 237-4(7) ), was not the only permissible way of evidencing the fact of sale, but incorrectly, I believe, concludes that Otis did not carry its burden of establishing that a sale took place in the absence of separate invoicing.

Separate invoicing was referred to in *Alexander & Baldwin* as a convenient fact which was not necessary to the result. I would regard separate invoicing by Otis as similarly unnecessary and as serving no useful purpose. It is not disputed that Otis transferred ownership of the parts to its customers and that the parts passed to the customers without substantial alteration. The findings of fact of the tax appeal court include a finding that Otis was engaged in the sale, as well as the manufacture, installation, repair and maintenance, of elevators and escalators. Since Otis was taxed as a contractor with respect to the parts imported for use in the installation of new elevators and escalators and the modernization of existing elevators and escalators, this finding seems clearly to imply that sales took place of the parts used in the repair and maintenance business. The stipulated facts, in my opinion, permit no other conclusion. Accordingly, I would reverse the tax appeal court's

application of a 4% use tax rate to the importation of the parts used in Otis' maintenance and repair business and, upon remand, would direct that a use tax rate of ½% be applied to all importations of parts by Otis during the tax years in question.

The major issue in this case is that dealt with in the shorter part II of the plurality opinion and concerns the valuation for use tax purposes of parts manufactured by Otis in its mainland factories and imported into Hawaii by Otis. The parts were used in the assembly and installation of new elevators and escalators; in modernization of existing elevators and escalators; and in maintenance and repair services. Otis was assessed a use tax on the value of the parts in their finished condition as they arrived in Hawaii.

The use tax imposed by HRS Chapter 238 accrues when the property becomes subject to the taxing jurisdiction of the state. In *Tax Appeal of Puna Sugar Co.*, 56 Haw. 621, 547 P.2d 2 (1976), we approved the use of the taxpayer's cost, including freight, (the "landed value"), as evidencing the value for use tax purposes of imported property upon its arrival in the state, subject to rebuttal by a showing that the market value was actually less. Otis contends that there are circumstances present here which were not present in Puna Sugar, and that the costs incurred by Otis in manufacturing the parts on the mainland, from materials purchased by Otis, should be excluded in computing the value upon which the use tax is levied. The result would be that the use tax value of the finished parts would consist of the cost to Otis of the materials from which they were manufactured, plus shipping costs, to the exclusion of conversion and administrative costs.[1] Otis contends that this result is mandated by *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64 (1963).

---

[1] It was stipulated that Otis has determined average percentages to be applied to the landed value of the parts for each of the tax years, pursuant to which the total of the raw material and shipping costs included in the landed value for each of the years varied from 40% to 45%, with the remainder of the landed value being attributable to conversion and administrative costs incurred in manufacturing the parts in Otis' factories.

*Halliburton* involved specialized oil well equipment manufactured by the taxpayer in Oklahoma and shipped into Louisiana for use there by the taxpayer. The Louisiana use tax applied at the rate of 2% on the "cost price" of any property not sold but used in the state, and was assessed on the entire cost of the equipment. The comparable sales tax was at 2% on the sale price of all property sold in the state. The question was whether the base for the use tax on the specialized equipment was limited to the value of the "raw materials and semifinished and finished articles" used in manufacturing the units, or could constitutionally include all costs of their manufacture. It was admitted that if the units had been manufactured in Louisiana either a sales tax or a use tax would have been paid on the cost of materials but no tax would have been paid on the labor or shop overhead costs incurred. Such labor and shop overhead costs were included in computing the cost of the units imported by the taxpayer, upon which the use tax was assessed. There is no indication in the opinion whether there were any manufacturers of such equipment operating in Louisiana.

It was held that the Louisiana use tax, as levied on the taxpayer's equipment, discriminated against interstate commerce because a local manufacturer-user would not pay a tax on the portion of its cost attributable to labor and shop overhead. The Court stressed that there was a substantial dollar-and-cents inequality in the tax burden between in-state and out-of-state manufacturer-users, but nowhere suggested that there had to be an existing in-state manufacturer-user to create an invalid discrimination. Instead, the Court emphasized the incentive for a manufacturer-user to locate in Louisiana to avoid the extra tax, and pointed out that if other states had similar taxes they could destroy the economic advantages of manufacturing in a single state for multi-state use. This would be "destructive of the very purpose of the Commerce Clause."[2] 373 U.S. at 72.

---

[2] The Court has very recently reiterated its adherence to this principle. In Boston Stock Exchange v. State Tax Commission, 429 U.S. 318, 329 (1977), citing *Halliburton*, it is said to be a "fundamental principle" that "no State may, consistent with the Commerce Clause, 'impose a tax which discriminates against interstate

The tax appeal court held, in the present case, that the use tax levied on Otis was not discriminatory, for two reasons. First, it said that Otis had paid no more tax than it would have paid if it had purchased the parts in Hawaii. Second, it said that, since there are no manufacturers of such parts in Hawaii, every taxpayer engaged in the same business as Otis in Hawaii must import its parts and pay the same taxes as Otis. The tax appeal court may be correct in both assertions, but neither furnishes a ground for distinguishing *Halliburton*. The first ground was expressly dealt with in *Halliburton*. The court said:

> . . . the Louisiana Supreme Court concluded that the comparison between in-state and out-of-state manufacturer-users is not the proper way to frame the issue of equality. It stated: "The proper comparison would be between the use tax on the assembled equipment and a sales tax on the same equipment if it were sold." On the basis of such a comparison, the out-of-state manufacturer-user is on the same tax footing with respect to the item used as the retailer of a similar item, or the competitor who buys from the retailer rather than manufacture his own. However, such a comparison excludes from consideration, without any explanation, the very in-state taxpayer who is most similarly situated to the appellant, the local manufacture-user. If the Louisiana Legislature were in fact concerned over any tax break the manufacturer-user obtains, it would surely have made special arrangements to take care of the

---

commerce . . . by providing a direct commercial advantage to local business.' (Citations omitted.) The prohibition against discriminatory treatment of interstate commerce follows inexorably from the basic purpose of the Clause. Permitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses 'would invite a multiplication of preferential trade areas destructive' of the free trade which the Clause protects. (Citation omitted)."

in-state as well as out-of-state loophole — unless, of course, it intended to discriminate. We can only conclude, therefore, that the proper comparison on the basis of this record is between in-state and out-of-state manufacturer-users. 373 U.S. at 71.

The second ground on which the tax appeal court attempted to distinguish *Halliburton* requires acceptance of the exact discrimination which *Halliburton* struck down. The Court gave no attention in *Halliburton* to whether any local manufacturer-user was actually operating and enjoying the benefit of the discrimination. What concerned the Court was the incentive offered to the Halliburton Co. to move a part of its manufacturing operations from Oklahoma to Louisiana. The tax appeal court says, in effect, that everyone will pay the same tax only as long as no one in the elevator business starts to manufacture parts in Hawaii. This is exactly the tax situation which *Halliburton* dealt with and condemned.

The plurality opinion purports to accept *Halliburton* as controlling authority, but concludes that a comparison of Otis with its in-state counterpart does not show that such a taxpayer would have received more favorable tax treatment than Otis. The plurality bases this conclusion upon the assumptions that the in-state counterpart would have imported the materials to be manufactured into the parts, and that the use tax upon the value of all such imported materials would have been levied at the rate of 4%. Since Otis was taxed only at the rate of ½% on the landed value of parts used in the assembly of new elevators and escalators and in the modernization of existing elevators and escalators, although at the rate of 4% on the landed value of parts used in maintenance and repair services, the plurality expresses confidence that the aggregate tax paid by Otis was less than a tax at the uniform rate of 4% on the value of all of the materials which would have been imported by its in-state counterpart.

The plurality is content to support this conclusion only by footnote examples of the relevant computations (footnotes 24 and 25). We are not informed how the computations are

reconciled with HRS § 238-2,[3] which prescribes the rates of the use tax. This statute creates three classes of importers for the purpose of the use tax, being those upon whom no tax is levied, those upon whom the tax is levied at the rate of ½% and those (all others) upon whom the tax is levied at the rate of 4%. The second class of importer, upon whom the tax is levied at the rate of ½%, is described in clause (2) of the statute, and consists (for present purposes) of (a) retailers

---

[3] § 238-2 Imposition of tax; exemptions. There is hereby levied an excise tax on the use in this State of tangible personal property which is imported, or purchased from an unlicensed seller, for use in this State. The tax imposed by this chapter shall accrue when the property is acquired by the importer or purchaser and becomes subject to the taxing jurisdiction of the State. The rates of the tax hereby imposed and the exemptions thereof are as follows:

(1) If the importer or purchaser is licensed under chapter 237 and is (A) a wholesaler or jobber importing or purchasing for purposes of resale, or (B) a manufacturer importing or purchasing material or commodities which are to be incorporated by the manufacturer into a finished or saleable product (including the container or package in which the product is contained) wherein it will remain in such form as to be perceptible to the senses, and which finished or saleable product is to be sold in such manner as to result in a further tax on the activity of the manufacturer as the manufacturer or as a wholesaler, and not as a retailer, there shall be no tax, provided, that if the wholesaler, jobber, or manufacturer is also engaged in business as a retailer (so classed under chapter 237), paragraph (2) shall apply to him, but the director of taxation shall refund to him, in the manner provided under section 231-23(d) such amount of tax as he shall, to the satisfaction of the director, establish to have been paid by him to the director with respect to property which has been used by him for the purposes stated in this paragraph.

(2) If the importer or purchaser is licensed under chapter 237 and is (A) a retailer or other person importing or purchasing for purposes of resale, not exempted by paragraph (1), or (B) a manufacturer importing or purchasing material or commodities which are to be incorporated by the manufacturer into a finished or saleable product (including the container or package in which the product is contained) wherein it will remain in such form as to be perceptible to the senses, and which finished or saleable product is to be sold at retail in this State, in such manner as to result in a further tax on the activity of the manufacturer in selling such products at retail, or (C) a contractor importing or purchasing material or commodities which are to be incorporated by the contractor into the finished work or project required by the contract and which will remain in such finished work or project in such form as to be perceptible to the senses, the tax shall be one-half of one per cent of the purchase price of the property, if the purchase and sale are consummated in Hawaii; or, if there is no purchase price applicable thereto, or if the purchase or sale is consummated outside of Hawaii, then one-half of one per cent of the value of such property.

(3) In all other cases, four per cent of the value of the property.

importing for purposes of resale, (b) manufacturers importing material to be incorporated, in such form as to be perceptible to the senses, into a finished product to be sold at retail, and (c) contractors importing material to be incorporated by such contractors into the finished work or project required by the contract, in such form as to be perceptible to the senses. The tax levied upon Otis with respect to the parts imported for use in the assembly of new elevators and escalators and in the modernization of existing elevators and escalators was assessed under clause (2) (C). The characterization of Otis, for this purpose, as a contractor importing material to be incorporated by the contractor into the finished work or project required by the contract in such form as to be perceptible to the senses, was not disputed in the tax appeal court and was incorporated by the tax appeal court into its findings and conclusions of law. No question with respect to this characterization of Otis was raised in this appeal and the rate of the tax upon Otis with respect to these parts is not an issue.

Following oral argument in this case, additional briefs were requested with respect to the questions set forth in the margin.[4] Supplemental briefs were filed by Otis and the tax director, both taking the position that the rate of tax upon a taxpayer described in clauses (1) and (2) of question #1 would

---

[4] 1. At what rate is the use tax imposed by HRS § 238-2 upon the value of raw materials imported by an in-state taxpayer (who is engaged in a vertical, integrated business in all respects similar to Otis), licensed pursuant to HRS § 237-9 to do both a contracting business and a service business, for the purposes of manufacturing such raw materials into elevator and escalator components and parts, which after their manufacture are used by the taxpayer in

(1) The assembly thereof into new elevator and escalator units and the installation of such units in buildings pursuant to construction subcontracts?

(2) the assembly and installation thereof in the course of complete renovation work on existing elevator and escalator units under modernization contracts?

(3) the installation thereof in existing elevators and escalators in the course of the performance of regular maintenance service?

(4) the installation thereof in existing elevators and escalators in the course of performance of occasional repair service?

2. Should the in-state taxpayer described in any part of Question #1 be classified for taxation under HRS § 232-2 as a manufacturer who does not sell the product and therefore is subject to tax under HRS § 238-2(3)?

be ½%, under either § 238-2(2) (B) or § 238-2(2) (C), the distinction between the classifications of manufacturer and contractor being not material. The position taken by the plurality implies that the plurality has concluded that the in-state taxpayer described in clauses (1) and (2) of question #1 should be classified, as suggested in question #2, as a manufacturer who does not sell the product and is therefore subject to tax under § 238-2(3) at the 4% rate there prescribed. For this result to be reached, Otis must fall without the scope of § 238-2(2) (B) and (C).

The plurality opinion leaves us groping for an interpretation of § 238-2 which will sustain its application of the higher tax rate. By hypothesis, Otis' in-state counterpart must be licensed under Chapter 237 as engaged in contracting and servicing, not as a manufacturer. In its business, it imports material to be incorporated into the work required by contracts for the installation or modernization of elevators and escalators, in such form as to be perceptible to the senses. Between importation and installation, the materials are altered in form to meet the requirements of the contracts. Had such alteration in form been accomplished on the site of the work, by sawing, shaping, drilling, mixing or the like, I cannot imagine how the case could be distinguished from § 238-2(2) (C): "a contractor importing or purchasing material or commodities which are to be incorporated by the contractor into the finished work or project required by the contract and which will remain in such finished work or project in such form as to be perceptible to the senses." Under the hypothesis, however, the materials will have been altered in form at premises removed from the site of the work and possibly before entry into the contract. Presumably, this is seen by the plurality as removing the case from § 238-2(2) (C). But before a 4% rate may be applied, the case must also be removed from § 238-2(2) (B).

The last-mentioned section applies to "a manufacturer importing or purchasing material or commodities which are to be incorporated by the manufacturer into a finished or saleable product . . . wherein it will remain in such form as to be perceptible to the senses, and which finished or saleable

product is to be sold at retail in this State, in such manner as to result in a further tax on the activity of the manufacturer in selling such products at retail.'' If a sale of the parts at retail takes place, Otis' hypothetical in-state counterpart, as a manufacturer, clearly meets all of the stated requirements of § 238-2(2) (B). The sale at retail requirement becomes a problem only because installation of and payment for the part is covered by a construction subcontract or a modernization contract. But we found no difficulty in concluding, in *In re Taxes, Alexander & Baldwin, Inc., supra,* that an automobile repair shop is engaged in the retail sale of parts when engaged in performing automobile repair and service contracts. Separate invoicing of the parts would appear to be critical to this conclusion, under Part I of the plurality opinion, but there is no reason to assume that this evidentiary element would be lacking in the business practices of Otis' in-state counterpart. The plurality conclusion in Part I of their opinion would have enabled Otis' in-state counterpart, if it chose to be taxed as a manufacturer for the tax years in question here, to obtain the benefits of the ½% rate under § 238-2(2) (B) by the simple expedient of separately invoicing the parts installed pursuant to construction subcontracts or modernization contracts.

This labored analysis has been made necessary by the failure of the plurality to explain its conclusion that Otis' in-state counterpart is not taxable as a contractor under § 238-2(2) (C) or as a manufacturer under § 238-2(2) (B). I can conclude only that the plurality sees the in-state taxpayer as a manufacturer who has chosen to force itself into the mold of § 238-2(3) by refraining from providing the separate invoicing which would place it within the plurality's reading of *Alexander & Baldwin* in this case. The comparison becomes even more difficult when we take into account the fact that the same business practices (for the hypothesis demands similarity) have resulted in a tax on Otis at the more favorable rate of ½%. Moreover, the discrepancy in the tax classifications and rates between Otis and its in-state counterpart not only conflicts with the basic assumptions of the hypothesis, but it is necessary to the conclusion reached by

the plurality. In order for the comparisons made by the plurality to be favorable to Otis in relation to its in-state counterpart, Otis must be taxed at a rate of ½% upon its importation of parts, while its in-state counterpart is taxed at a rate of 4% on its importation of materials. Because the hypothesis requires that the ultimate use of all of the parts, and the manner of their disposition, must be identical, this result can be attributed by the plurality only to a mistake of the tax director in determining Otis' tax rate. Yet if Otis and its in-state counterpart were both taxed at a 4% rate, as the plurality seems to demand, the same discrimination against Otis would exist as if both were taxed at the ½% rate. The attempt of the plurality to avoid *Halliburton* by demonstrating that there is in fact no discrimination is wholly unconvincing.

Because I view *Halliburton* as controlling, I would require that the value for use tax purposes of the parts imported by Otis be determined by excluding the value added by Otis in converting materials into finished products in its out-of-state manufacturing processes. For this purpose, I would see no difference between the parts imported by Otis for use in its maintenance and repair services and the parts imported for use in fulfilling construction subcontracts and modernization contracts. Accordingly, I would reverse the judgment of the tax appeal court on the issue dealt with in Part II of the plurality opinion, and would remand this case for a redetermination of the use tax value of the parts which are the subject of this appeal.