868 P.2d 419

In the Matter of the Tax Appeal of
HAWAIIAN FLOUR MILLS,
INC., Appellant

No. 16996.

Supreme Court of Hawai'i.

Feb. 4, 1994.

Kelly J. Salling, Deputy Atty. Gen., Honolulu, for appellee Director of Taxation, State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

Appellant Hawaiian Flour Mills, Inc. (HFM) instituted an action in the tax appeal court contesting the assessment of general excise taxes (GET) and use taxes made by appellee State of Hawai'i Director of Taxation (Director) on the sale and use of certain food products that HFM imported into Hawai'i for resale to American Hawaii Cruises (AHC), a cruise line. HFM contended that the assessments violated the Commerce Clause of the United States Constitution because sales of competing local food products were exempt from the GET, pursuant to Hawai'i Revised Statutes (HRS) § 237–24(18)(C) (Supp.1992).[1] It sought a full refund of the taxes, which it had paid under protest. The Director initially denied that HRS § 237–24(18)(C) unconstitutionally discriminated against interstate commerce. HFM moved for summary judgment. The Director then conceded that HRS § 237–24(18)(C) was unconstitutional on its face, but disagreed with HFM as to the type and amount of the remedy owed, and filed a cross motion for summary judgment. The tax appeal court entered an order granting the Director's motion and granting in part and denying in part HFM's motion. HFM appeals from that order. It also appeals from an order denying its motion for sanctions, in which it contended that the Director's initial denial that HRS § 237–24(18)(C) was unconstitutional was made in bad faith.

For the following reasons, we vacate in part and affirm in part the tax appeal court's order on the motions for summary judgment

Arthur B. Reinwald, Honolulu, for appellant Hawaiian Flour Mills, Inc.

1. HRS § 237–24 (Supp.1992) provides in relevant part:
 **Amounts not taxable.** This chapter [HRS ch. 237, General Excise Tax Law] shall not apply to the following amounts:
 . . . .
 (18) Amounts received from sales of ... (C) agricultural, meat, or fish products grown, raised, or caught in Hawai'i, when such sales are made to any person or common carrier in interstate or foreign commerce, or both, whether ocean-going or air, for consumption out-of-state by such person, crew, or passengers on such shipper's vessels or airplanes[.]

and vacate its order on the motion for sanctions.

## I. *BACKGROUND*

HFM sells food products to AHC. Some of the food products it sells are imported. Many are what would commonly be described as "processed" foods, such as packaged meats, frozen fruits and vegetables, jams and jellies, and salad dressings.

On February 9, 1990, following an audit by the Hawai'i Department of Taxation (Department), the Director issued notices of proposed assessments of additional GET and use taxes on, among other things, HFM's food sales to AHC. The Director contended that HFM owed the following taxes:

| Fiscal Year Ended | General Excise Tax | Use Tax |
|---|---|---|
| 6/30/87 | $35,153.16 | $3,598.81 |
| 6/30/88 | $39,975.36 | $4,047.51 |
| 12/31/88 | $26,188.36 | $2,445.34 |

On April 27, 1990, HFM filed a protest of the proposed assessments with the Department. It claimed that HRS § 237–24(18)(C)'s GET exemption for sales of local foods violated the Commerce Clause because it put HFM's competing imported foods, sales of which were subject to the GET, at an unfair competitive disadvantage (presumably because some of the GET was reflected in the prices of its food products). HFM also appeared to argue that because the use tax was designed to complement the GET, if the GET was unconstitutional, the use tax was as well.

On August 2, 1990, the Director issued final assessment notices. On August 9, 1990, a Department tax auditor wrote to HFM's attorneys, explaining the reason for the Director's rejection of HFM's protest:

> The exemption under Section 237–24(18)[ (C) ], H.R.S. for ["]agricultural, meat, or fish products grown, raised or caught in Hawai'i" has been limited by the Department to "include only those commodities which are sold in their original or natural state." (Income Technical Memorandum No. 32 dated May 20, 1968.) The Department has in practice only given an exemption for local fresh produce, not for local processed foods. Since the exemption, as applied, exempts only local fresh produce, and not local processed foods, the Department does not believe that foreign processed foods are in competition with local fresh produce and are being discriminated against.

The Director therefore took the position that HRS § 237–24(18)(C) did not discriminate against HFM's imported processed foods because the exemption was limited to "fresh" Hawai'i-produced foods and the two did not compete against each other for AHC's business. Stated otherwise, the Director essentially argued that the favorable tax treatment given to local fresh foods had no effect on HFM, adverse or otherwise, and HFM therefore had no standing to assert a Commerce Clause violation.

On August 24, 1990, HFM paid the assessments (including applied credits and interest) under protest. Five days later it filed a notice of appeal to the tax appeal court, asserting that the appropriate remedy for the unconstitutional assessments was a refund of the assessed GET and use taxes, together with accrued interest and costs.

The Director filed his answer to HFM's notice of appeal on September 18, 1990, denying that HRS § 237–24(18)(C) was unconstitutional. At some point following HFM's filing of its notice of appeal, the Director instructed his staff to administratively sever HRS § 237–24(18)(C) from the rest of the exemption statute, disallowing any taxpayer from taking the exemption on its GET return.

On July 9, 1992, HFM moved for summary judgment. HFM again argued that the purpose and effect of HRS § 237–24(18)(C) was to discriminate unconstitutionally in favor of locally produced foods at the expense of its out-of-state foods. It also addressed the Director's position, set forth in the auditor's August 9, 1990 letter, that HRS § 237–24(18)(C) did not discriminate against imported processed foods because they did not compete against local fresh food products. HFM adduced an affidavit from the Senior Purchasing Agent of AHC, which essentially stated that local fresh food products did compete against imported processed foods for AHC's business. In addition, HFM argued

that the use tax was unconstitutional as applied because it imposed a tax burden that local competitors did not bear.

The Director filed his opposition to HFM's motion for summary judgment and his own cross motion for summary judgment on October 20, 1992. The Director admitted that HRS § 237–24(18)(C) was unconstitutional on its face and argued that it should be severed from the statute. But he disputed the type and amount of the remedy that HFM claimed it was owed.

The Director argued that under *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), he had the option to fashion a remedy that combined a refund with a retroactive assessment of taxpayers who took the exemption on their GET returns during the relevant periods. Specifically, the Director stated he would retroactively assess HFM's competitors for the tax periods for which the limitations period had not yet expired (fiscal years ended June 30, 1988 and December 31, 1988) and make a refund to HFM for statutorily "closed" periods (fiscal year ended December 31, 1987).

With respect to the amount of the refund, the Director argued that it was delimited not by HFM's sales of food products that were in competition with exempt local fresh foods, as HFM argued, but by its sales of products that would have met the requirements for exemption under HRS § 237–24(18)(C) had that statute not made an unconstitutional instate versus out-of-state distinction. That meant the refund should be limited to the GET HFM paid on its sales of fresh foods. Because, the Director argued, only a small portion of HFM's sales to AHC fit that bill, it was entitled to a small refund.

The Director also argued that because only a portion of the fresh Hawaiian food sold by HFM to AHC was actually consumed out-of-state—the majority (sixty-four percent) was consumed, he claimed, at various ports in Hawai'i—the GET refund due HFM should be further reduced. HRS § 237–24(18)(C), he contended, exempted only fresh Hawai'i-produced foods sold "for consumption out-of-state."

Finally, the Director argued that the use tax was constitutional because it treated HFM and similarly situated taxpayers equally. Thus, HFM was not entitled to a use tax refund.

On February 10, 1993, HFM filed a motion for sanctions, essentially arguing that the Director's belated admission that HRS § 237–24(18)(C) was unconstitutional on its face should have been made two years earlier in his answer to HFM's notice of appeal. HFM asserted that the Director had instructed his staff to administratively sever the exemption from the rest of the statute before he filed his answer on September 18, 1990. That instruction, HFM argued, was tantamount to an admission that the exemption was unconstitutional and the Director's subsequent denial of that fact in his answer was therefore frivolous. It sought the attorneys' fees it had spent in establishing the exemption's unconstitutionality in its motion for summary judgment. On March 10, 1993, the tax appeal court denied the motion for sanctions.

On March 31, 1993, the tax appeal court entered an order granting the Director's motion for summary judgment and granting in part and denying in part HFM's motion. The court ordered that HRS § 237–24(18)(C)'s exemption was unconstitutional and that it should be severed from the rest of the statute. In addition, it ordered that HFM was entitled to a remedy consisting of: (1) a refund of the difference between the GET it had actually paid and the GET it would have paid had it been taxed at the same rate as its competitors; or (2) an assessment and collection of back taxes by the Director against HFM's competitors who had benefited from the exemption; or (3) a combination of the first two options. If the Director chose the refund option, the court ordered that the refund should be limited to the GET that HFM had paid on its sales of fresh foods that were consumed out-of-state. Thus, under the refund option, HFM was entitled to refunds of $209.15, $838.50, and $449.73 for the fiscal years ended June 30, 1987, June 30, 1988 and December 31, 1988, respectively. Finally, the court concluded

that HFM was not entitled to a use tax refund because the tax was not unconstitutional as applied to HFM.

HFM appeals from the March 31, 1993 summary judgment order and the March 10, 1993 sanctions order.

## II. DISCUSSION

### A. Summary Judgment

#### 1. GET

The issues on appeal of the summary judgment order center on the type and amount of the remedy HFM is entitled to receive for having paid the GET under an unconstitutional statute.

HFM and the Director retake the positions they staked out in their respective motions for summary judgment. Thus HFM argues that because HRS § 237–24(18)(C) put its imported processed foods at a disadvantage vis-a-vis local fresh foods in the competition for AHC's business, it is entitled to a meaningful retrospective remedy and that that remedy should be a full refund of the GET it had paid on all of its food sales to AHC.

The Director acknowledges that HFM is entitled to some form of backward-looking relief for having paid an unconstitutional tax. But he argues that: (1) the appropriate remedy can consist either of a retroactive assessment of those taxpayers who took advantage of HRS § 237–24(18)(C)'s exemption or a refund of the GET that HFM paid under protest; and (2) the choice of the remedy is his prerogative.

If he chooses the refund option, the Director argues that HFM is not entitled to a refund of all of the GET it paid on its food sales to AHC, but is entitled to a refund only of taxes imposed on its sales of fresh food that was actually consumed outside of Hawai'i's territorial waters.

■ This court reviews the award of summary judgment under the same standard applied by the trial court. *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993). Pursuant to Hawai'i Rules of Civil Procedure (HRCP) 56(c) (1990), summary judgment is proper where the moving party demonstrates that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Id.* at 258, 861 P.2d at 6 (citing *Gossinger v. Association of Apartment Owners of The Regency Ala Wai,* 73 Haw. 412, 417, 835 P.2d 627, 630 (1992)).

#### a. Remedy Options

There can be no real dispute concerning the range of options available to the Director to remedy the constitutional defect in HRS § 237–24(18)(C).

In *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Department of Business Regulation of Florida,* 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), the United States Supreme Court considered the types of relief available to a taxpayer who pays taxes under an unconstitutional statute. In *McKesson,* wholesale liquor distributors challenged a Florida liquor tax that gave special rate reductions to certain products commonly grown in Florida and used in alcoholic beverages produced there. The Florida Supreme Court agreed with McKesson that the tax scheme unconstitutionally discriminated against interstate commerce. It ruled, however, that equitable considerations mandated that any relief be prospective only.

■ A unanimous Supreme Court reversed. The Court held that because exaction of taxes constitutes a deprivation of property, the due process clause of the fourteenth amendment to the United States Constitution mandates that a state provide procedural safeguards against the imposition of unlawful taxes. *Id.* at 36, 110 S.Ct. at 2250. In general, a state could satisfy due process requirements by providing either "predeprivation" process (*e.g.,* authorizing taxpayers to bring suit to enjoin imposition of a tax before its payment) or "postdeprivation" process. *Id.* Because Florida employed a system of financial sanctions and summary remedies designed to encourage taxpayers to tender tax payments *before* challenging a tax, Florida had to provide adequate postdeprivation process:

> To satisfy the requirements of the Due Process Clause, therefore, in this refund action the State must provide taxpayers

with, not only a fair opportunity to challenge the accuracy and legal validity of their tax obligation, but also a "clear and certain remedy," [*Atchison, T. & S.F.R. Co. v. O'Conner,* 223 U.S. 280 [32 S.Ct. 216, 56 L.Ed. 436] (1912) ], for any erroneous or unlawful tax collection to ensure that the opportunity to contest the tax is a meaningful one.

*Id.,* 496 U.S. at 39, 110 S.Ct. at 2251 (footnote omitted).

 The Court held that a state retains flexibility in providing "meaningful backward-looking relief," *id.* at 31, 110 S.Ct. at 2247, as long as it "treats [the taxpayer] and its competitors in a manner consistent with the dictates of the Commerce Clause." *Id.* at 39–40, 110 S.Ct. at 2252. Thus, the Court held that retroactive relief could be accorded in one of three general ways. A state could: (1) refund the difference between the tax a taxpayer paid and the tax that it would have paid had it been assessed at the preferential rate; (2) retroactively assess the taxpayer's favored competitors at the non-preferential rate; or (3) use a combination of the two methods. *Id.* at 40, 110 S.Ct. at 2252.

 In the present case, the remedial options outlined in the tax appeal court's order were consistent with the methods set forth in *McKesson.* Under *McKesson,* then, HFM clearly would receive the process it is due if the Director retroactively assesses those taxpayers who benefited from HRS § 237–24(18)(C)'s exemption.[2] A retroactive assessment would eliminate any discriminatory preference, at least in hindsight, and therefore effectively extinguish any Commerce Clause violation. Thus, any inquiry into whether HFM's imported processed food products were in competition with fresh Ha-

wai'i-produced foods would be unnecessary: all GET taxpayers who competed for AHC's business, whether they were local or foreign or whether they sold fresh or processed foods, would be on an equal tax footing.[3]

The real battle lines are drawn around the refund remedy. As noted, HFM argues that it is entitled to a full refund of the GET it paid on the sales of all of its food products, processed and fresh. The Director argues that if he chooses refund as a remedy, it should be limited to the GET that HFM paid on sales of (i) fresh foods (ii) that were actually consumed outside the territorial waters of Hawai'i.

### b. *Processed v. Fresh Foods*

HFM relies primarily on *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), to support its argument that it should receive a refund of the GET imposed on sales of its processed foods.

 In *Bacchus,* liquor wholesalers challenged the constitutionality of a Hawai'i tax which imposed a twenty percent GET on wholesale liquor sales. Specifically, the wholesalers claimed that exemptions from the tax granted to okolehao and fruit (pineapple) wine violated, among other things, the Commerce Clause. *Id.* at 265, 104 S.Ct. at 3052. The United States Supreme Court agreed with the wholesalers. The Court held that the exemptions violated the Commerce Clause's "cardinal rule" against "simple economic protectionism" by discriminating against non-Hawaiian liquor products in both purpose and effect. *Id.* at 270–71, 104 S.Ct. at 3053–55. In so holding, the Court rejected the State of Hawai'i's argument that there was no discriminatory effect on interstate commerce because "okolehao and pineapple

---

2. We presume, of course, that if the Director selects this remedial option, he will make a good faith effort to administer and enforce the retroactive assessments in a timely manner. While his efforts to collect back taxes may not be completely successful, the adequacy of this remedy depends on his ability to implement it quickly and thoroughly. *See McKesson,* 496 U.S. at 40 n. 23, 110 S.Ct. at 2252 n. 23.

3. Given that a retroactive assessment would constitute an adequate remedy, it is unclear why the Director labors at such length in his answering

brief to establish that HRS § 237–24(18)(C) should be severed from the rest of the statute. Presumably, by arguing that the exemption should be severed, the Director means that no taxpayer would be entitled to the exemption. Since a number of taxpayers apparently did claim the exemption during the challenged period, the only practical way in which the Director could "sever" the exemption would be to assess those taxpayers retroactively. Under *McKesson* its ability to do that is clear.

wine do not compete with the other products sold by the wholesalers":

> [N]either the small volume of sales of exempted liquor nor the fact that the exempted liquors do not constitute a present "competitive threat" to other liquors is dispositive of the question whether competition exists between the locally produced beverages and foreign beverages; instead, they go only to the extent of such competition. It is well-settled that "[w]e need not know how unequal the Tax is before concluding that it unconstitutionally discriminates."

*Id.* at 268–69, 104 S.Ct. at 3053–54 (quoting *Maryland v. Louisiana,* 451 U.S. 725, 760, 101 S.Ct. 2114, 2136, 68 L.Ed.2d 576 (1981)) (footnote omitted). Thus, the Court held that "[a]s long as there is *some competition* between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect." *Id.* at 271, 104 S.Ct. at 3055 (emphasis added).

HFM argues that, under *Bacchus,* it can establish a constitutional violation by showing that there was at least "some competition" between its processed foods and exempt local fresh foods. Once it makes that showing, HFM argues, under *McKesson* it is entitled to a meaningful remedy, which must be adequate to redress its specific Commerce Clause injury—*i.e.,* the extra tax burden imposed on the sales of its imported processed foods. Under the refund option, HFM maintains, that means a full GET refund.

The Director does not dispute that the existence of some competition between HFM's non-exempt imported processed foods and exempt local fresh foods is sufficient under *Bacchus* to establish a constitutional violation. He argues, however, that because he has already conceded the unconstitutionality of the exemption, "the competition discussion in *Bacchus* is not relevant to the decision as to the scope of the remedy. The relevant inquiry for remedy purposes is the scope of the exemption."

The Director's argument that the "violation inquiry"—*i.e.,* whether there was "some competition" between exempt and non-exempt products—is divorced from the "reme-

dy inquiry" essentially reduces to the following: when the legislature enacted HRS § 237–24(18)(C), it clearly intended to give local fresh food products a competitive advantage over all processed foods, regardless of whether they were produced in Hawai'i or elsewhere. To effectuate this intention, the Director has always restricted HRS § 237–24(18)(C)'s exemption to sales of fresh local foods; sellers of processed foods, whether local or imported, have never been allowed to claim the exemption.

Given that practice, the Director argues, the fact that HFM imported its processed foods rather than purchased them locally is irrelevant to why it is not entitled to the exemption under HRS § 237–24(18)(C); the only determinative fact is that it sold processed, not fresh, foods. Consequently, if HFM were given a refund of the GET it paid on its sales of processed foods, it would effectively be getting an exemption that no other taxpayer—local or foreign—ever had received and which the legislature never intended to grant. Thus, the Director's main argument on the refund option appears to be that the Constitution requires only that HFM be put in the position that it would have been in had HRS § 237–24(18)(C) never included the local preference, and that it should not be made better off simply because the statute turned out to be constitutionally defective. That means that, even if HFM could establish an "abstract" violation of its Commerce Clause rights by showing that its imported processed foods were in some competition with local fresh foods, HFM would still not be entitled to a refund of any of the GET it had paid on the sales of those products.

■ "Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to protect persons from injuries to particular interests, and their contours are shaped by the interests they protect. Our legal system's concept of damages reflects this view of legal rights." *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252, 259 (1978) (paragraph break omitted). The fatal flaw in the Director's argument is that it ignores the fundamental principle of law that the Supreme Court ar-

ticulated in *Carey:* the nature of the injury determines the scope of the remedy. The Director acknowledges that, under *Bacchus,* HFM could establish that § 237–24(18)(C) is unconstitutional as applied to it by showing that there was "some competition" between its imported processed foods and the exempt local products. Thus, the tax discrimination against its *processed* foods is HFM's Commerce Clause injury. Once HFM demonstrates that injury, *McKesson* holds that it is entitled to *meaningful* retrospective relief. If the Director chooses to provide that relief by way of a refund, the refund must consist of the GET it paid on its sales of processed foods. Otherwise, HFM's particular Commerce Clause injury would go unremedied, and it would not receive the meaningful relief that the Due Process Clause mandates.

 The Director's attempt to escape these basic principles is unavailing. The mere fact that HFM hypothetically might be "better off" than it would have been had the statute not been constitutionally infirm in the first place is purely of the state's own doing and cannot be the basis for the state to skirt its constitutional obligations. As the Supreme Court stated in *McKesson:*

> If, through the State's own choice of relief, petitioner ends up paying a smaller tax than it would have paid if the State initially had imposed the highest rate on everyone, petitioner would not enjoy an unpalatable "windfall." Rather, petitioner would merely be protected from the comparative economic disadvantage proscribed by the Commerce Clause.

496 U.S. at 43, 110 S.Ct. at 2253–54.

If the state chooses the refund option, the amount refunded should include the GET that HFM paid on sales of its processed foods, as long as they were in some competition with exempt local fresh foods.

### c. *Evidence of "Some Competition"*

 Having determined the scope of the refund remedy in general terms, we now turn to the question whether, for purposes of summary judgment, there is a genuine issue of material fact precluding HFM's entitlement to that remedy, as a matter of law.

That is, has HFM demonstrated that there is no genuine issue of material fact that its imported processed foods competed with exempt local fresh foods for AHC's business?

HFM adduced an affidavit of AHC's Senior Purchasing Agent, Judy Furukawa, stating in relevant part:

7. American Hawaii Cruises will purchase local food products, if the food products can be purchased at a price better than or equal to out-of-state food products, and if the local food products can be supplied in the required amounts and needed specifications.

8. If the prices of local food products make it economically advantageous to purchase local food products, rather than out-of-state food products, then American Hawaii Cruises will purchase the local food products. These include, but are not limited to local food products such as chilled beef, chicken or fruits rather than out-of-state food products such as cut beef and chicken that is pre-packaged and frozen or pre-cut fruits that are canned or jarred.

9. American Hawaii Cruises understands that many of the food products purchased can be considered processed in one form or another (i.e. cut, pre-packaged frozen steaks and chicken). If fresh local products can be purchased at similar prices and quantities they would certainly compete with those food products currently being purchased.

The Director attempted to rebut this affidavit by submitting an affidavit of one of his auditors. That affidavit recounted statements purportedly made by Furukawa that might be construed as casting some doubt on her affidavit. For instance, it stated that Furukawa told the auditor that "[p]repackaged grapefruit sections would not be substituted for fresh grapefruit on the AHC menus." The affidavit also attributed similar statements to a senior vice president of AHC (*e.g.,* "[f]resh items are not substituted with canned items."). These statements are inadmissible hearsay and as such are of no value on summary judgment. HRCP 56(e) (1990) (opposing or supporting affidavits must set forth facts as would be admissible in evidence).

Furukawa's affidavit established that HFM's products, in general, were in some competition with fresh local products. It was enough therefore to preclude the Director from obtaining summary judgment. On the other hand, the affidavit does not state that *all* of the processed foods that HFM sold to AHC were in competition with exempt products for the entire period in question. Because HFM is entitled only to a refund of the GET it paid on sales of the *particular* foods that actually competed with fresh local foods for AHC's business, there is a genuine issue of material fact as to the amount of the refund owed. Thus, HFM was not entitled to summary judgment either. On remand HFM bears the burden of establishing specifically which of its products competed with exempt products for AHC's business.

### d. *Foods Consumed in Hawai'i*

The Director also argues that HFM's GET refund should be limited to its sales of food that was actually consumed outside of the territorial waters of Hawai'i because HRS § 237–24(18)(C) is restricted to food sold "for consumption out-of-state." He argues that because his auditors determined that only thirty-six percent of the food HFM sold to AHC was consumed outside of Hawai'i, it was entitled to a refund of only 36% of the GET paid on its sales to AHC. HFM counters that even though some portion of the food it sold to AHC may have been consumed in Hawai'i, those sales still should be exempt because their overall interstate character is not lost by short stops at various ports in Hawai'i.

HFM's argument misconceives the basic nature of its claim. It seeks a *refund* of the GET it paid as retrospective relief for the violation of its rights under the Commerce Clause. It does not seek an *exemption* under HRS § 237–24(18)(C). The two are not the same. Consequently, HFM's argument

that HRS § 237–24(18)(C) should be interpreted to apply to food that was consumed during a cruise ship's brief stops in Hawai'i is irrelevant. The only relevant inquiry for purposes of HFM's Commerce Clause claim is whether the Director's proposed adjustment would treat HFM and its competitors *equally.*

A state treats taxpayers equally when it "refund[s] to [a taxpayer] the difference between the tax it paid and the tax it would have been assessed were it extended the same rate reductions that its competitors *actually received.*" *McKesson*, 496 U.S. at 40, 110 S.Ct. at 2252 (emphasis added). Thus, if HFM's competitors actually received exemptions only for their sales of food consumed outside of the territorial waters of Hawai'i, as the Director argues they were [4], HFM's refund should be similarly circumscribed.

The tax appeal court granted summary judgment in favor of the Director based on computations made by the Director that only thirty-six percent of the food that HFM sold to AHC was consumed out-of-state. The computations were based on certain schedules obtained from AHC. Those schedules were attached to an affidavit of counsel for the Director, declaring that they were "true and correct copies of schedules received from AHC," but not stating that the affiant had personal knowledge of their contents. The schedules are plainly hearsay and the Director made no attempt to demonstrate that any hearsay exception applied. HRCP 56(e) requires that affidavits submitted in support of or in opposition to a motion for summary judgment be made on personal knowledge and "set forth such facts as would be admissible in evidence." Accordingly, summary judgment in the Director's favor was improper because the tax appeal court had an insufficient basis to determine the specific amount of the refund reduction for foods consumed in-state.

4. The Director stated by affidavit that his "personnel have been instructed to allow the [HRS § 237–24(18)(C)] exemption only for products which are to be consumed outside the three-mile territorial waters boundary. This exemption has been enforced in this manner consistently against all similarly situated taxpayers." One of his auditors also declared by affidavit that "auditors have applied the HRS § 237–24(18)(C) exemption for local agricultural products consumed out-of-state in a consistent manner as to all taxpayers taking the exemption, including the requirement that the exempt sales be for consumption outside Hawaiian territorial waters." HFM points to no evidence in the record directly challenging these affidavits.

In sum, if the Director chooses the refund option, the amount of the refund should be limited to the GET imposed on sales of food that was consumed out-of-state, as long as the manner in which the Director makes that adjustment is consistent with way he made it for HFM's competitors during the relevant periods.

### e. *Conclusion on the Refund Option*

HFM is entitled to a refund of the GET it paid on sales of all of its food products, regardless of whether they were "fresh" or "processed," that competed with exempt fresh Hawai'i-produced foods for AHC's business. But the refund should be limited to the GET it paid on sales of food that was consumed outside of Hawai'i. There is a genuine issue of material fact concerning which of the food products that HFM sold to AHC actually competed with the exempt local foods and how much of the food was consumed out-of-state. Accordingly, on the record before it, the circuit court erred in quantifying the refund to which HFM was entitled by way of summary judgment.

### 2. *Use Tax*

HFM argues that the use tax imposed on its imported food products pursuant to HRS Chapter 238 violates the Commerce Clause.

 HRS § 238-2 (1985) provides for "an excise tax on the use in this State of tangible personal property which is imported . . . for use in this State." The general theory behind such a tax is "to make all tangible property used or consumed in the State subject to a uniform tax burden irrespective of whether it is acquired within the State, making it subject to the [general excise] tax, or from without the State, making it subject to a use tax at the same rate." *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 66, 83 S.Ct. 1201, 1202, 10 L.Ed.2d 202, 204 (1963). In the absence of a use tax that complements a GET, sellers of goods acquired out-of-state theoretically enjoy a competitive advantage over sellers of goods acquired in-state: not being subject to the GET, out-of-state products would be less expensive than in-state products, the prices

of which would presumably reflect some pass-on of the GET. Thus,

> [t]he [use] tax buttresses the general excise tax as it is designed to prevent the avoidance of excise taxes through direct purchases from the mainland. Its ultimate purpose is to remove the competitive advantage an out-of-state wholesaler or retailer would otherwise have over a seller subject to the payment of State excise taxes.

*In re Habilitat, Inc.*, 65 Haw. 199, 209, 649 P.2d 1126, 1133–34 (1982) (footnote omitted).

 HFM contends that the use tax and the GET are correlative and must be read *in pari materia*. It argues that because the use tax is designed to function as an ersatz GET for out-of-state goods that would be subject to the tax if sold in-state, there is no need for the tax when the out-of-state goods' in-state counterparts are GET-exempt. In that situation, the use tax serves not to equalize tax burdens between in-state and out-of-state goods, but simply to saddle out-of-state goods with higher taxes. HFM argues that the same logic applies to its situation because the sales of its competitors' fresh local foods are exempt from the GET. Thus, the use tax on its imported foods is not compensatory, but discriminatory. *See* HRS § 238-3 (1985).

 "Equal treatment for in-state and out-of-state taxpayers *similarly situated* is the condition precedent for a valid use tax on goods imported from out-of-state." *Halliburton*, 373 U.S. at 70, 83 S.Ct. at 1203 (emphasis added); *see also In re Otis Elevator Co.*, 58 Haw. 163, 173, 566 P.2d 1091, 1097 (1977). The first step, then, is to determine with which Hawai'i taxpayers HFM is similarly situated.

HFM is essentially an intermediary. It engages in two distinct transactions when it sells to AHC: first it purchases food from a seller on the mainland and then it resells the food to AHC. For purposes of determining the constitutionality of the use tax, therefore, HFM is similarly situated with local intermediaries who purchase food products in Hawai'i for resale to AHC (or other cruise lines). Consequently, HFM can make a

Commerce Clause claim only if the use tax treats it unfairly as compared to those taxpayers. It does not.

On the resale leg of its business, HFM is in the same position as any Hawai'i taxpayer selling food directly to AHC, including local intermediaries who get the HRS § 237–24(18)(C) exemption, and, as discussed above, must be taxed at non-discriminatory rates. The use tax, however, is not aimed at HFM's resale transaction, but at the preceding one—HFM's initial purchase from the mainland seller. HFM has failed to adduce any evidence showing unequal treatment with respect to that transaction. That is, HFM does not point to any GET exemption that applies when its local intermediary competitors purchase local foods for resale to AHC. Presumably, then, the GET applies to those transactions. As a result, HFM is treated equally with similarly situated taxpayers: its initial purchase transactions are subject to the use tax and its local competitors' initial purchases are subject to the GET.

■ Because HFM failed to adduce any evidence that the use tax is unconstitutionally discriminatory, it is not entitled to a refund of the use taxes it paid under protest.[5]

### B. *Sanctions*

HFM appeals the denial of its motion for sanctions. The motion was based on the Director's blanket denial of the allegations in paragraph 4(c) of HFM's notice of appeal to the tax appeal court, which alleged that:

> [t]he exemption of only Hawaii agricultural products is an unconstitutionally discriminatory burden on interstate commerce. The appropriate remedy is to exempt all agricultural products, regardless of where

raised, grown or caught, sold to carriers in interstate commerce.

HFM contends that the Director was aware from the inception of the present tax appeal that HRS § 237–24(18)(C)'s exemption was unconstitutional, but that he waited more than two years before conceding the point in his memorandum opposing HFM's motion for summary judgment. Specifically, HFM alleges that immediately after HFM filed its notice of appeal, and before he filed his answer, the Director effectively admitted that the exemption was unconstitutional by instructing his staff to administratively sever it from the statute and to disallow any taxpayer from claiming the exemption. Given that admission, HFM argues, the Director's subsequent denial of the unconstitutionality of the exemption in his answer was disingenuous. HFM contends that the supposedly bad faith denial forced it to conduct discovery and move for summary judgment on the question, incurring substantial attorneys' fees in the process. HFM therefore argues that it is entitled to its attorneys' fees under HRS § 607–14.5 (Supp.1992).[6] It alternatively argues that the Director's answer, which was signed by his attorney, violated HRCP 11.

■ HRS § 607–14.5 applies only when a party seeks "money damages or injunctive relief, or both." HFM seeks neither. It seeks a tax refund. Thus, the denial of the motion for sanctions based on HRS § 607–14.5 was not clearly erroneous. *See Coll v. McCarthy*, 72 Haw. 20, 27–28, 804 P.2d 881, 886–87 (1991).

■ Before we consider whether the tax appeal court properly denied HFM's motion

---

**5.** HFM raised new arguments for the first time in its reply brief on appeal, essentially contending that certain exclusions under HRS Chapter 238 applied to its sales to AHC. Because those arguments were not raised in the tax appeal court or in its opening brief on appeal, they are deemed waived. Hawai'i Rules of Appellate Procedure 28(b)(4) (1985).

**6.** HRS § 607–14.5 (Supp.1992) provides:

**Attorneys' fees in civil actions.** (a) In any civil action in this State where a party seeks money damages or injunctive relief, or both, against another party, and the case is subse-

quently decided, the court may, as it deems just, assess against either party, and enter as part of its order, for which execution may issue, a reasonable sum for attorneys' fees, in an amount to be determined by the court upon a specific finding that the party's claim or defense was frivolous.

(b) In determining the award of attorneys' fees and the amounts to be awarded, the court must find in writing that all claims or defenses made by the party are frivolous and are not reasonably supported by the facts and the law in the civil action.

on the Rule 11 ground, we must first determine the applicable standard of review.

In *De Silva v. Burton*, 9 Haw.App. 222, 832 P.2d 284 (1992), the Intermediate Court of Appeals (ICA), looking to the standard certain federal appellate courts had used to review Federal Rules of Civil Procedure (FRCP) 11 determinations, adopted a three-tiered standard for HRCP 11 rulings:

> If the facts relied upon by the [trial] court to establish a violation of the Rule are disputed on appeal, we review the factual determinations of the [trial] court under a clearly erroneous standard. If the legal conclusions of the [trial] court that the facts constitute a violation of the Rule is [sic] disputed, we review that legal conclusion *de novo*. Finally, if the appropriateness of the sanction imposed is challenged, we review the sanction under an abuse of discretion standard. [Footnote omitted.]

*Id.* at 228, 832 P.2d at 287 (quoting *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 828 (9th Cir.1986)). The ICA recognized that in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), the United States Supreme Court had rejected the three-tiered standard of review and held that all aspects of a FRCP 11 determination should be reviewed under the abuse of discretion standard. Nevertheless, the ICA concluded that the three-tiered standard was well-suited to Rule 11, which calls upon a trial court to make factual, legal and discretionary determinations. *Id.*, 9 Haw.App. at 230, 832 P.2d at 288. It also reasoned that the three-tiered standard had worked well in other cases involving a mix of determinations and that Rule 11 did not present sufficiently different considerations to justify review under the more deferential unitary abuse of discretion standard. *Id.*

We draw a different conclusion and hold that all aspects of a Rule 11 determination should be reviewed under the abuse of discretion standard. We thus overrule *De Silva* to the extent that it is inconsistent with our holding.

■ At the outset we note, as the ICA did, that the scope of the disagreement between the two standards is narrow. Under both the three-tiered and unitary abuse of discretion standards, a trial court "would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell*, 496 U.S. at 405, 110 S.Ct. at 2461. In addition, under both standards the appropriateness of the sanction imposed is reviewed for abuse of discretion.

The only significant point of divergence between the two standards is the degree of deference given to the trial court's legal conclusion that a particular "pleading, motion or other paper" violated, or did not violate, Rule 11. Under the three-tiered standard, as long as the trial court's version of the relevant facts is not clearly erroneous and its view of the existing law not wrong, application of the Rule 11 standard is reviewed *de novo*. *De Silva*, 9 Haw.App. at 228, 832 P.2d at 287. We think that a trial court's basic Rule 11 determination, even though it may be described as a conclusion of law, is more appropriately reviewed for abuse of discretion.

First, as the Supreme Court noted in *Cooter & Gell*, a Rule 11 inquiry is heavily fact-intensive, requiring careful consideration of the particular circumstances of each case, and involving questions of reasonableness, credibility and, often, motive. 496 U.S. at 401–02, 110 S.Ct. at 2459. Because the trial court is better positioned than an appellate court to marshall and weigh the pertinent facts, its determinations are due a substantial degree of deference. *Cf. Coll v. McCarthy*, 72 Haw. at 28, 804 P.2d at 886 ("Where the court's conclusions are dependent upon the facts and circumstances of each individual case, the clearly erroneous standard of review applies.").

Second, we think Rule 11's mandate that attorneys and parties litigate responsibly and in good faith will be furthered by a unitary abuse of discretion standard of review. Deployed on the front lines of litigation, the trial court "is best acquainted with the local bar's litigation practices and thus best situated to determine when a sanction is warranted to serve Rule 11's goal of specific and general deterrence." *Id.*, 496 U.S. at 404, 110 S.Ct. at 2460. Abuse of discretion review is better suited than *de novo* review as a

means of ensuring that trial courts' Rule 11 determinations will have real teeth, thereby "enhanc[ing] these courts' ability to control the litigants before them." *Id.*

Finally, given the fact-dependent nature of the Rule 11 determination, we think that by adopting an abuse of discretion standard of review little will be lost in terms of ensuring uniformity in the application of Rule 11 sanctions. *See id.* ("'[f]act-bound resolutions cannot be made uniform through appellate review, *de novo* or otherwise.'" (quoting *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933 (7th Cir.1989))).

■ Having determined the applicable standard of review, we now apply that standard to the tax appeal court's ruling that there was no Rule 11 violation in this case.

Rule 11, which is clear, unambiguous, and *mandatory* in its terms, provides in relevant part:

> Every *pleading* ... of a party represented by an attorney shall be signed by at least one attorney of record.... The signature of an attorney or party constitutes a certificate by him [or her] that he [or she] has read the pleading ...; that to the best of his [or her] knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading ... is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall* impose upon the person who signed it, a represented party, or both, an appropriate sanc-

tion, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, ... including a reasonable attorney's fee.

(Emphasis added.)

Being in the nature of an action "for the collection of taxes," HFM's tax appeal is expressly governed by the HRCP in general, *see* HRCP 81(b)(8) (1990), and Rule 11 in particular. *See also* HRCP 1 (1990) ("These rules govern the procedure in the circuit courts of the State in all suits of a civil nature ... with the exceptions stated in Rule 81.").

The Director's answer, filed in this matter on September 18, 1990, was unquestionably a "pleading," *see* HRCP 7(a) (1990), which was "responsive" to the claim asserted by HFM in its notice of appeal, filed on August 29, 1990. *See* HRCP 12(b) (1990) and Rules of the Tax Appeal Court (RTAC) 2(b) (1981). As such, it was governed by both HRCP 8(b) (1990) [7] and RTAC 5 (1981).[8] By its express terms, HRCP 8(b) subjects the answering "pleader" to the "obligations set forth in Rule 11." Indeed, "the Director does not dispute that he is subject to HRCP Rules 11 and 8(b)." Director's answering brief at 33.

Paragraph 4(c) of HFM's notice of appeal alleged that "[t]he exemption of only Hawai'i agricultural products is an unconstitutionally discriminatory burden on interstate commerce" and that "[t]he appropriate remedy is to exempt all agricultural products, regardless of where raised, grown or caught, sold to carriers in interstate commerce." The Director answered the entire paragraph with a general denial. Not until two years later, on October 20, 1992, after having persisted in

---

7. HRCP 8(b) (1990) provides in relevant part: *Defenses; Form of Denials.* A party shall state in short and plain terms his [or her] defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies.... Denials shall *fairly meet the substance* of the averments denied. When a pleader intends in good faith to deny only a part or a qualification of an averment, he [or she] shall specify so much of it as is true and material and shall deny only the remainder.

8. RTAC 5 (1981) provides in relevant part:

> Within 20 days after a notice of appeal has been served, the party upon whom it has been served shall file an answer or appropriate motion.... The answer shall be drawn so that it will advise the appellant and the court fully of the nature of the defense. It shall contain a specific admission or denial of each material allegation set forth in the notice of appeal and a statement of any facts upon which the answering party relies for defense.... The answer shall contain the signature of the answering party or his [or her] counsel.

defending against HFM's tax appeal and only in response to HFM's motion for summary judgment, did the Director reveal by way of affidavit that "[s]ince the filing of [HFM's] Notice of Appeal, the Department of Taxation ... has not allowed the unconstitutional exemption to be taken on any taxpayer's general excise tax returns." The Director does not dispute that the question whether HRS § 237–24(18)(C) entailed an unconstitutional exemption of some sort was key to HFM's tax appeal. And yet it took two full years after the commencement of the present action, and only after literally being forced to do so by HFM's motion for summary judgment, for the Director first to admit that he had been disallowing what he himself characterized as the "unconstitutional exemption" ever "[s]ince the filing of [HFM's] Notice of Appeal."

 The only explanation the Director offers for his failure to admit in his answer that which he had readily admitted to his staff in the Department of Taxation is that the allegations in paragraph 4(c) of HFM's notice of appeal were only qualifiedly true.[9] *See* Director's answering brief at 32–33. HRCP Rule 8(b), however, does not excuse pleaders from making admissions simply because they require qualification; to the contrary, it *mandates* that "[w]hen a pleader intends in good faith to deny only a part or a qualification of an averment, he shall specify so much of it as is true and material and shall deny only the remainder." Had the Director followed Rule 8(b)'s simple mandate by answering paragraph 4(c) with a qualified admission, the issues on summary judgment would have been substantially narrowed and HFM would have been spared as least some of the expenses it incurred in pursuing its tax appeal. In our view, the Director's failure to comply with HRCP 8(b) therefore constitutes a *per se* violation of HRCP 11's prohibition against the interposition of pleadings for the "improper purpose" of "caus[ing] unnecessary delay or needless increase in the cost of [the] litigation."

Accordingly, we hold that the tax appeal court abused its discretion in denying HFM's motion for sanctions. We therefore vacate the tax appeal court's order dated March 10, 1993, and, in accordance with HRCP 11, remand for an award of appropriate sanctions against the Director to compensate HFM for its reasonable expenses, including attorneys' fees, incurred in connection with the question of the constitutionality of HRS § 237–24(18)(C).

### III. *CONCLUSION*

For the foregoing reasons, we: (1) vacate that part of the tax appeal court's March 31, 1993 summary judgment order concerning the amount of the refund HFM is owed for the GET it had paid under protest and affirm that part of the order concerning the use taxes owed by HFM and remand for further proceedings consistent with this opinion; and (2) vacate the tax appeal court's order denying HFM's motion for sanctions and remand for an award of appropriate sanctions.

LEVINSON, Justice, concurring.

I go to the trouble of writing separately, despite the fact that I join fully in the opinion of the court, because I feel impelled to get off my chest some additional and personal observations that are born of almost twenty-two years in the legal profession, almost seventeen of them as a private practitioner. If I have learned anything in that time, it is that what "goes around" truly does "come around" and that lawyers represent their clients' interests best when they discharge their responsibiiities in accordance with the preamble to the Hawai'i Rules of Professional Conduct (HRPC), which reflect the tireless efforts of various members of the Hawai'i bench and bar to whom we owe a debt of gratitude, and which became effective on January 1, 1994 by order of this court dated December 6, 1993. That preamble, which summarizes "a lawyer's responsibilities," provides in relevant part:

---

9. The Director argues, for instance, that HFM's averment that "[t]he exemption of only Hawaii agricultural products is an unconstitutionally discriminatory burden on interstate commerce" was "denied as an overbroad statement of the law because the State limited the exemption to only Hawai'i fresh produce and not to Hawai'i processed foods[.]" Director's answering brief at 32.

■ A lawyer is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice.

■ As a representative ·of clients, a lawyer performs various functions. As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system. As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealing with others. As intermediary between clients, a lawyer seeks to reconcile their divergent interests as an advisor and, to a limited extent, as a spokesperson for each client. A lawyer acts as evaluator by examining a client's legal affairs and reporting about them to the client or to others.

. . . .

■ A lawyer's conduct should conform to the requirements of the law ... in professional service.... A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

. . . .

■ Many of a lawyer's professional responsibilities are prescribed by the Rules of Professional Conduct, as well as substantive and procedural law. However, a lawyer is also guided by personal conscience and the approbation of professional peers. A lawyer should strive to attain the highest level of skill, to improve the law and the legal profession[,] and to exemplify the legal profession's ideals of public service.

. . . .

■ In the nature of law practice ..., conflicting responsibilities are encountered. Virtually all difficult ethical problems arise from conflict between a lawyer's responsibilities to clients, to the legal system, and to the lawyer's own interest in remaining an upright person while earning a satisfactory living.... Within the framework of [the HRPC] many difficult issues of professional discretion can arise. Such issues must be resolved through the exercise of sensitive professional and moral judgment guided by the basic principles underlying the rules.

I should add that none of the general precepts set forth above imposes any obligation on the legal profession not already expressly contained in the Code of Professional Responsibility, which was appended to the Rules of the Supreme Court by order dated October 13, 1970 (as amended).

I believe that section II.B. of the opinion of the court today should serve as a "wake up call" to those lawyers who have played fast and loose with the obligation of good faith pleading contained in HRCP 8(b) and 11 for far too long. Apparently, they have not learned that "[l]itigation is the pursuit of practical ends, not a game of chess." *City of Indianapolis v. Chase Nat'l Bank*, 314 U.S. 63, 69, 62 S.Ct. 15, 17, 86 L.Ed. 47, *reh'g denied*, 314 U.S. 714, 62 S.Ct. 355, 86 L.Ed. 569 (1941).

Former Chief Justice Burger, who unquestionably had the credentials to assume his self-appointed role as the nation's "commentator general" on legal etiquette, was right on the mark when he observed that:

lawyers who know how to think but have not learned how to behave are a menace and a liability ... to the administration of justice.... [T]he necessity for civility is relevant to lawyers because they are ... living exemplars—and thus teachers—every day in every case and in every court; and their worst conduct will be emulated ... more readily than their best.

Address to the American Law Institute, Washington, D.C., reported in the *National Observer*, May 24, 1971, and reprinted in D. Shrager and E. Frost, *The Quotable Lawyer* 193 (1986).

We would do well to heed the wisdom of Judge Frankel, as reported in the *Washington Post* on May 7, 1978:

> We [lawyers] must alter our prime axiom—that we are combat mercenaries available indifferently for any cause or purpose a client is ready to finance.... We should all be what I would term "ministers of justice." As such, we would have to reconsider and revise a system of loyalty to clients that results too often in cover-ups.... A favorite quotation in the legal profession ... is Lord Brougham's declaration that an advocate "knows but one person in all the world, and that person is his client...." For him Lord Brougham said, the advocate would stand against the world.... Lord Brougham was wrong; we should be less willing to fight the world and ... more concerned to save our own souls. As ministers of justice, we should find ourselves more positively concerned than we now are with the pursuit of truth.

*The Quotable Lawyer* at 101–02.

In light of Judge Frankel's views, there is some poetic justice in the fact that it was the Government Lawyers Section of the Hawai'i State Bar Association that insisted that Rule 1.13(f) be included in the new HRPC. HRPC 1.13(f) provides in relevant part:

> If a government lawyer knows that an officer ... associated with the government is engaged in action [or] intends to act or refuses to act in a matter related to the lawyer's representation that is a violation of a legal obligation to ... the public, ... the lawyer shall proceed as is reasonably necessary in the best interest of ... the public. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, ... governmental chain of command, and any other relevant consideration.... Such measures may include among others:
>
> (1) asking for reconsideration of the matter; [and]
>
> (2) referring the matter to a high authority in the government, including if warranted by the seriousness of the matter, referral to the highest government official that can act in behalf of the government on the particular matter as determined by applicable law even if the highest authority is not within the agency or department the lawyer represents; and
>
> (3) advising that a separate legal opinion on the matter be sought and considered; and
>
> (4) divulging of information to persons outside the government....

Although I believe that the actions of the Director's counsel in this matter would reasonably implicate the provisions of the new rule, I wish to make it clear that I intend no gratuitous criticism of the Department of the Attorney General or any of its deputies in particular. My comments regarding the importance of "civility" in the conduct of the legal profession apply equally to all of its members, including myself. Collectively, everyone of us must be better monitors of our daily professional behavior.